**Affirmed and Opinion Filed February 13, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-12-01498-CR

### RONNIE ALEXANDER LEE, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 203rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-10-62661-P**

## MEMORANDUM OPINION
Before Justices FitzGerald, Lang, and Fillmore
Opinion by Justice FitzGerald

A jury convicted appellant of capital murder and appellant was sentenced to life imprisonment. In a single issue on appeal, appellant asserts the trial court erred in failing to give the jury an accomplice witness instruction. We affirm the trial court's judgment.

### BACKGROUND

On November 4, 2010, Antowne Ross was shot and killed. Ross was a known drug dealer, and he kept his money in a Crown Royal bag tied inside his waistband. Ross and his girlfriend, Quanysha Williams, sold drugs out of a house at 3618 Cauthorn Drive in Dallas. In the early morning of November 4, at approximately 6:00 a.m., Ross and Williams were awakened by a knock on the door. Ross answered the door and was greeted by Alyssa Maness, who said she had to use the restroom. Ross, Maness, and Williams were all acquainted, and

Maness had been at the house the previous weekend. After Maness came in the house, Williams heard noise and a struggle as Ross said, "oh, oh." The noise sounded as though Ross was trying to push against the door. Williams "jumped out of her covers," and by that time, two men had pulled Ross out onto the porch. Williams panicked, and ran to close the door because she did not have a weapon. She saw Ross struggle with two men, one of whom was holding Ross while the other pointed a long gun at him. She did not hear the men say anything, and noticed only that they had "bandages" on their faces. Ross and the two men started struggling over the gun and ended up in the front yard of the house. After Williams closed the door, she heard three shots.

Williams looked out the window and saw Ross lying "on the side with his leg up." She grabbed Maness and asked what the two men were doing there. Maness replied that she did not know, "that she just brought her friends." Williams' phone was dead, so she ran to get help. Maness ran away.

Williams explained that Ross carried the Crown Royal bag on his belt when he conducted drug transactions. Williams returned to the house after Ross was shot. She did not notice whether Ross still had the Crown Royal bag, and she did not know what happened to it.

A Dallas police detective who investigated the crime scene testified that when he arrived at 3618 Cauthorn, he and a trainee investigator located seven fired cartridge cases. All of the cartridges appeared to be from an assault rifle and were 7.62 x 39mm caliber. He observed blood at the end of the driveway in front of the house.

Detective Scott Sayers was the lead detective investigating the murder. Detective Sayers met with appellant about a week after the murder. The interview was recorded and portions of the recording were admitted into evidence and played for the jury at trial. During the interview, appellant claimed that he was inside the house with both girls doing drugs before he shot Ross. He stated that the assault rifle belonged to Ross and was sitting in a corner. Detective Sayers

asked appellant to draw a diagram of the house showing where everything was located, and he complied. Detective Sayers testified, however, that appellant's drawing did not accurately represent the house. Appellant told Detective Sayers that he knew what kind of money Ross had in the house and described it as "a hundred thousand, at least." Nonetheless, appellant denied that he wanted to rob anyone. Appellant claimed that he and Ross argued over money, and he admitted firing the rifle several times after a struggle over the gun. He said the first shot was a warning shot, but he also said it mistakenly hit the ground. He kept shooting as Ross tried to run. Appellant further claimed that he blacked out while he was shooting Ross.

Appellant also told Detective Sayers that Ross had a pistol in a holster that someone must have taken before the police arrived. Detective Sayers testified that he did not believe appellant because Ross was wearing boxer shorts and could not have worn a holster with them.

At one point, Detective Sayers allowed appellant to make a phone call. Appellant told the person he called, "they got me" and "nobody knew I was here . . . somebody told on me." Detective Sayers interpreted this to mean that appellant had been eluding police and had not planned on surrendering voluntarily. Appellant also told the person he called, "I need them to be on point." Detective Sayers understood this statement to mean that other people needed to get their stories straight.

Detective Sayers testified that Ross was shot five times. During cross-examination, defense counsel inquired as to whether the location of Ross's wounds suggested no intent to kill. On re-direct, the State asked what intent is indicated if a person is shot five times by an assault rifle. Sayers replied, "trying to kill them."

Heather Thomas, a firearm and toolmark examiner at the Southwestern Institute of Forensic Sciences, examined the cartridge casings found at the crime scene. She concluded that

–3–

all seven rounds came from the same gun, which, based on the caliber, was an AK-47 or SKS-type firearm.

An autopsy was performed on Ross, and the medical examiner determined that the cause of death was multiple gunshot wounds. The medical examiner testified that Ross suffered five distinct areas of gunshot wound. The first wound, which was itself lethal, entered Ross's buttocks and passed through his abdomen before exiting his chest. The bullet severed his right iliac artery, causing extensive blood loss. The position of the wound and the angle of the trajectory suggested that Ross was not facing the gun and was falling forward when he was shot. The second shot struck Ross in his groin area; the bullet fragmented and exited his hip in two places. The third shot left an irregular wound with no exits, and suggested the bullet had ricocheted off something else before striking Ross. The fourth shot likewise struck something else first and fragmented before entering Ross's left thigh. The shrapnel severed his left iliac artery, causing even more blood loss. The fifth shot hit Ross in the right knee and traveled right to left and upward, suggested Ross was already on the ground. Ross also had injuries on his left hand and wrist and his right forearm and hand, suggesting that he had fallen. Ross had no drugs in his system.

LeMarkus Phillips was with appellant and Maness on November 4, and was also indicted for capital murder. Phillips testified that he knew appellant "through mutual relations from [his] girlfriend's home girl." Phillips stated that when appellant asked him if he wanted to make some money, he replied affirmatively. Appellant drove him to Maness's house in Fort Worth where they picked her up and discussed "hitting a lick." Phillips explained that "hitting a lick" means to commit a robbery. Maness gave them directions on where to go, and she told them that Ross would have a Crown Royal bag containing money and drugs, and that he would also have plasma TVs that they could steal. Phillips testified that when they got to the house, appellant parked a

–4–

couple of blocks away, and Maness got out first to knock on the door, because she was acquainted with Ross. Phillips came to the door after Maness went inside and stalled Ross by talking about purchasing some merchandise. Ross was wearing boxer shorts. Phillips testified that he saw appellant approach around the front corner of the house carrying an assault rifle. Phillips claimed he had not seen the gun before that moment. According to Phillips, he watched as appellant pointed the gun at Ross, and the two began to tussle over the gun. During the fight, Ross got pulled out into the middle of the yard and was on his knees. Phillips testified that Ross grabbed the barrel of the gun, but appellant fired, causing Ross to jerk his hand back. Ross asked appellant "let me make it," but appellant replied, "just come up off that the issue." Phillips interpreted the latter statement to mean "hand over the Crown Royal bag," which Phillips understood contained the money and the drugs. Ross tried to run, but appellant began shooting again. Phillips said Ross was on the ground as appellant shot him. Phillips claimed that he watched everything happen, but was stunned, and that he took off running after appellant shot Ross. He and appellant met back at the car and drove away.

At the conclusion of the trial, the jury returned a guilty verdict. This appeal followed.

## ANALYSIS

In his sole issue on appeal, appellant contends Phillips was his accomplice as a matter of law, and the trial court erred by failing to give the jury an accomplice-witness instruction. The State concedes error, but maintains the error did not cause appellant to suffer egregious harm.

Appellant and Phillips were both charged with capital murder. Therefore, Phillips was an accomplice as a matter of law. *See Blake v. State*, 971 S.W.2d 451, 455 (Tex. Crim. App. 1998). As a result, the trial court erred in failing to instruct the jury on the law of an accomplice-witness. *See Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006).

When, as here, a defendant does not object, or states that he has no objection to a jury charge, an error will not result in reversal unless the record shows "egregious harm" such that the defendant was denied a fair trial. *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g), *overruled on other grounds by Rodriquez v. State*, 758 S.W.2d 787, 788 (Tex. Crim. App. 1988). Egregious harm exists when the record shows that a defendant has suffered actual, rather than merely theoretical, harm from jury-charge error. *Almanza*, 686 S.W.2d at 174. Egregious harm consists of error affecting the very basis of the case, depriving the defendant of a valuable right, or vitally affecting a defensive theory. *See Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011).

A defendant is egregiously harmed by the trial court's omission of an accomplice-witness instruction if a rational jury would have found the corroborating evidence so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive. *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991). A trial court's failure to give an accomplice-witness instruction will generally be harmless when the non-accomplice evidence tends to otherwise fulfill the purpose of the instruction — that is, if it corroborates the accomplice testimony by tending to connect the defendant to the offense. *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005).

Appellant argues he was egregiously harmed because there was no non-accomplice testimony to establish that he committed the offense of capital murder.[1] Specifically, appellant complains that there was no corroborating evidence of the *mens rea* for the offense.

---

[1] A person commits capital murder if he intentionally commits murder in the course of attempting to commit or committing a robbery. See TEX. PENAL CODE ANN. §19.03(a)(2) (West 2005).

–6–

To support a conviction based on the testimony of an accomplice, there must be corroborating evidence that tends to connect the defendant with the offense. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). Corroboration is not sufficient if it merely shows the offense was committed. *Id*. In our review, we eliminate all of the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). The corroborating evidence need not be sufficient by itself to establish guilt; there simply needs to be "other" evidence "tending to connect" the defendant to the offense alleged in the indictment. *Id*. It may confirm a "mere detail" rather than the elements of the offense. *Lee v. State*, 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.). We look at the particular facts and circumstances of each case and consider the combined force of all the non-accomplice evidence that tends to connect the accused to the offense. *Smith v. State,* 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

Having reviewed the record, we do not agree that Phillips's testimony was necessary to connect appellant to the offense with which he was charged. Non-accomplice evidence does not have to be sufficient to establish guilt beyond a reasonable doubt, connect the defendant to every element, or even directly link the defendant to the commission of the offense. *Dowthitt v. State*, 931 S.W.2d 244,249 (Tex. Crim. App. 1996). Here, there was ample corroborating evidence that tended to connect appellant to the offense.

Appellant's admissions to Detective Sayers all connect him to the offense. He admitted firing the weapon and being at the crime scene. Appellant used a deadly weapon, pointed it at Ross, and struggled with Ross before shooting him. Appellant said he fired a warning shot, but then later said he made a "mistake" when his first shot missed Ross. A defendant's overt acts are generally reliable circumstantial evidence of his intent. *See Laster v. State*, 275 S.W.3d 512, 524

(Tex. Crim. App. 2009). Likewise, the specific intent to kill may be inferred from the use of a deadly weapon. *See Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012).

The other non-accomplice evidence showed that appellant knew Ross had money on him. He claimed he went inside the house, but his inaccurate drawing of the interior suggested otherwise. Although appellant claimed Ross was wearing a gun in a holster, the evidence showed he was wearing boxer shorts, so the holster was an unlikely accessory. During the investigation, appellant was hiding, and he endeavored to have others get their stories straight. The Crown Royal bag was never located.

The evidence also showed that two men came to the door after Ross let Maness in the house. One of the men had a long gun, and pointed it at Ross. Ross was involved in a struggle and pulled outside the door. Seven shots were fired by the man holding the gun, five of which hit Ross. Ross was shot from behind and was either on the ground or falling forward. The shots were fired from an assault rifle, and Ross died from the gunshot wounds. When a person is shot five times with an assault rifle, it is indicative of the fact that someone is trying to kill them. The intent to kill may be inferred from the wounds inflicted. *See, e.g., Ex parte Henderson*, 384 S.W.3d 833, 838 (Tex. Crim. App. 2012) (Cochran, J., concurring).

The method of committing the crime, the nature of the wounds on the victim, and the use of a deadly weapon are all facts from which a reasonable jury could infer that appellant intended to kill Ross. Thus, the non-accomplice testimony tended to connect appellant with the crime. Because the non-accomplice testimony is not so unconvincing as to render the State's case clearly and significantly less persuasive, we conclude appellant did not suffer egregious harm from the lack of an accomplice-witness instruction.

Appellant's issue is overruled. The judgment of the trial court is affirmed.


/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
121498F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

RONNIE ALEXANDER LEE, Appellant

No. 05-12-01498-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 203rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-10-62661-P.
Opinion delivered by Justice FitzGerald.
Justices Lang and Fillmore participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered February 13, 2014

/Kerry P. FitzGerald)
KERRY P. FITZGERALD
JUSTICE